# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BRENDA WILLMORE,

        Plaintiff,

v.                                                                Case No. 22-2352-TC-ADM

SAVVAS LEARNING COMPANY LLC,

        Defendant.

---

## MEMORANDUM AND ORDER

Plaintiff Brenda Willmore ("Willmore") brought this employment discrimination case against her former employer, defendant Savvas Learning Company LLC ("Savvas"). This case is now before the court on two matters that arose months after discovery closed and after the court entered the pretrial order. The first is a motion for sanctions in which Savvas asks the court to order Willmore's counsel, Patrick Reavey, to personally pay the excess costs, expenses, and attorneys' fees that Savvas incurred from February 3, 2023, through the present or, alternatively, for defending any pre-trial motion Willmore filed (or presumably will file) after January 25, 2024, because of "his unreasonable and vexatious conduct." (ECF 146, at 1.) As explained below, this motion is denied. Plaintiff's counsel[1] has certainly over-litigated this case, but so has Savvas to some degree. Indeed, the two current motions are examples of overkill by both sides. The court

---

[1] The undersigned generally refers to a party and/or its counsel by using the party name only, without distinguishing between the two. The court departs from that practice here, to some extent, given the nature of the issues presented. Savvas is seeking sanctions against Willmore's counsel personally and the grounds for the motion call into question the way in which he has litigated the case. The court will therefore sometimes use "Willmore" as it typically would (to refer to Willmore as a party and also collectively with her attorney in this litigation), but the court will use "Plaintiff's counsel" where the court does not believe it is fair to attribute his conduct to plaintiff Brenda Willmore as a party to this case.

agrees with Savvas that Plaintiff's counsel has at times behaved unreasonably and vexatiously during this litigation, but this behavior is most accurately characterized as a lack of professionalism in the way he treated Savvas witnesses, and in his tone with opposing counsel and the court. Although unpleasant, this did not unnecessarily run up the costs of this litigation enough to warrant sanctions under § 1927.

The other motion now before the court is Willmore's Motion for Additional Discovery and Second Motion to Compel. (ECF 139.) Willmore filed this motion on February 16, 2024, which was more than six months after discovery closed and even more months than that after the 30-day rule set forth in D. Kan. Rule 37.1(c) expired. Plaintiff's counsel has no colorable claim of diligence in attempting to resolve the specific discovery disputes at issue, which he allowed to languish for months. The court therefore denies this motion as untimely.

## I.    SAVVAS'S SECOND MOTION FOR SANCTIONS (ECF 146)

Savvas seeks sanctions pursuant to 28 U.S.C. § 1927 for Plaintiff's counsel's "unreasonable and vexatious conduct from February 3, 2023, through the present." (ECF 146, at 1.) Savvas complains that he continued to pursue this lawsuit even after Savvas produced documents in connection with its initial disclosures on February 3, 2023, that showed Savvas terminated Willmore's employment for the legitimate, nondiscriminatory reasons of poor performance and insubordination. Savvas also points to all the discovery Willmore received from Savvas and from the two school district customers that complained about her poor performance. (*Id.* at 2; ECF 146-1.) Savvas says Plaintiff's counsel ignored all of this discovery "in favor of a scorched earth approach to litigation," as demonstrated by his latest litigation tactic of seeking to reopen discovery at this late stage of the case "to support [a] conspiracy theory on spoliation sanctions." (ECF 146, at 3-4.) Savvas goes on to recite the "ad hominem attacks" that Plaintiff's

counsel directed at both Savvas's counsel and the court that were wholly unnecessary.  (*Id.* at 4-5.)  Savvas argues this warrants the imposition of costs and attorneys' fees.  (*Id.* at 1, 12.)  Because these arguments call into question Plaintiff's counsel's overall approach to this litigation, the court begins by explaining this case's unfortunately lengthy, and at times convoluted, procedural history.

A.   BACKGROUND

1.  **The Gist of the Case**

Savvas is a learning solutions company that develops and publishes educational materials for pre-K through 12th grade students.  Willmore worked for Savvas (and its predecessors in interest) for more than 20 years.  In approximately 2014, she became the Account Manager responsible for selling products to school districts in Kansas.  As the years went on, two of the largest school districts in the state refused to work with her: (1) in 2018, the Blue Valley School District; and (2) in April of 2021, the Derby School District.  So she was taken off those accounts.  Savvas contends that Willmore also had other performance issues such as difficulties working with specialists on her team, below-average sales performance, and falsifying records in Salesforce.

When Savvas fired Willmore on May 18, 2021, she was 59 years old.  She claims Savvas discriminated against her on the basis of her gender and age when it terminated her employment.  Willmore contends that Savvas has a history of hiring and promoting younger male employees over older female employees.  And although Willmore's mere removal from the Blue Valley and Derby accounts were not the only reasons Savvas terminated her employment, she contends that Savvas's other reasons are pretextual.

2.  **Savvas Document Production Difficulties Begin**

On May 19, the parties requested their first of several discovery conferences, which the court convened to discuss scheduling issues in light of difficulties Savvas was having producing documents in advance of Savvas witness depositions.  (ECF 35-38.)  After exploring these issues

with the parties, the court ordered them to further confer about the anticipated timing of Savvas's document production and their subsequent plan to complete discovery and then to file a joint motion to amend the scheduling order.  (ECF 38.)  About three weeks later, the parties filed a joint motion explaining that they expected Savvas's document production to be complete in late June and that Willmore planned to take most of the Savvas depositions in late July.  (ECF 40.)  The parties therefore requested an extension of case-management deadlines, which the court granted in an amended scheduling order that gave the parties until August 11 to complete discovery and until August 25 to submit their proposed pretrial order; the court also re-set the pretrial conference and the dispositive-motion deadline to September 11 and 28, respectively.  (ECF 41.)

The wave of discovery disputes began in early July.  On July 7, the court convened a discovery conference to discuss disputes concerning Savvas's production in response to some of Willmore's requests for production of documents ("RFPs").  (ECF 49, 66.)  Willmore's RFP No. 4 sought Salesforce documents regarding contacts with the Blue Valley and Derby School District accounts for the five years before Willmore was fired.  Savvas had produced some responsive documents but was still working on producing more.  (ECF 66, at 4-6.)  The next issue was RFP No. 7, which asked Savvas to search particular custodians using certain search terms for a specified time period.  Savvas had apparently run the searches incorrectly, resulting in a voluminous production that contained many documents outside the search parameters, and the metadata load files did not contain custodian names.  (*Id.* at 10-19.)  The parties also discussed Savvas's production in response to some other RFPs, as well as its privilege log.  (*Id.* at 20-34.)  Ultimately, Savvas agreed to produce a privilege log that same day, to fix the metadata issues in its production in response to RFP No. 7 by July 14, and to supplement the other RFPs by July 18.  (ECF 49.)

Less than two weeks later, the parties were back for another discovery conference with the court on July 18 to discuss their ongoing issues with Savvas's production in response to RFP No. 7.  (ECF 54.)  By then, Savvas had realized that it needed to re-run the searches and reproduce the entire set of responsive documents, and two additional disputes had come up during the parties' discussions about that re-production.  (ECF 64, at 2-3.)  First, Willmore had asked Savvas to add an additional custodian, Savvas in-house counsel Andy Yoo.  But Savvas explained that it did not believe it was necessary to search Yoo's ESI because he was not involved in the decision to fire Willmore.  (*Id.* at 3-6, 11.)  Rather, Savvas's in-house employment and compliance counsel, Debi Debiak, was involved in that decision and she was already one of the other custodians.  (*Id.*)  Debiak simply reported up to Yoo about the advice she gave to the business unit about terminating Willmore, and then Debiak later communicated with Yoo about Willmore after Savvas received a preservation letter from Willmore's counsel.  (*Id.*)  After hearing from the parties, the court explained that it sounded like Yoo's email would not be responsive because RFP No. 7 only sought documents from "SAVVAS employees . . . who were involved in any discussions or decisions about ending plaintiff's employment," and Yoo was not involved in the decision to terminate Willmore's employment.  (*Id.* at 7-13.)

The other issue Savvas raised that had come up when it was re-running these searches involved one of the custodians, Savvas CEO Bethlam Forsa.  When Savvas ran the search terms against Forsa's account, it realized she had certain categories of documents relating to things like furloughs during the pandemic and employee salary information for the entire company that were "really sensitive business information that is not relevant to the case," and Savvas sought to withhold those approximately 40-50 documents from the production.  (*Id.* at 14-15.)  In response to Savvas's inquiry about how to handle these types of documents, the court told Savvas that it

could lodge a relevance objection as to this batch of documents (as both parties acknowledged that disparate pay is not an issue in the case) so that these lingering issues would not hold up Savvas's reproduction in response to RFP No. 7, which Willmore was eager to get sooner rather than later in light of upcoming depositions. (*Id.* 16-21; *see also* ECF 54.)

A few hours later, Willmore filed a motion to reconsider the court's "ruling" that Savvas could withhold the documents from Forsa's collection with company-wide furlough and salary information. (ECF 55.) The court promptly denied the motion because the court had not made a definitive "ruling" that permitted Savvas to withhold the documents. Neither party had formally motioned the court to decide the issue. Rather, the parties had contacted the court to discuss certain logistics associated with Savvas making its production in response to RFP No. 7 expeditiously in view of then-upcoming depositions. The court's solution to keep that production rolling was to allow Savvas to lodge a relevancy objection as to this batch of documents, so the next step for Willmore would be to file a formal motion to compel production of those documents. (ECF 56.)

On July 26, Willmore filed a motion to compel documents responsive to RFP Nos. 4 and 7, including a request for Willmore's attorneys' fees incurred in making the motion. (ECF 63.) As to RFP No. 4, the motion sought to compel Savvas to produce documents from Salesforce for the Derby and Blue Valley accounts. And as to RFP No. 7, the motion sought to compel Savvas to produce the subset of documents from Forsa's account that were not relevant. When Willmore filed her reply brief, it significantly exceeded this court's page limits for discovery-related briefs, so the court struck it from the record and gave Wilmore an opportunity to refile a compliant brief. (ECF 67, 70.) Wilmore refiled the reply brief, using the following font:

Plaintiff submits the following Reply in support of her motion to compel (Doc. 63):

    Defense counsel directs sharp and inaccurate criticism (see Doc. 65, pp. 1, 2, and 9) at his

opposing party and her counsel. He references Plaintiff failing to take accountability for what is contained in

(ECF 73, at 1.)

Not long after Willmore filed the above motion to compel (and while it was still pending), Savvas filed a motion for sanctions.  (ECF 69.)  This motion also exceeded this court's page limits for discovery-related briefs, so the court also struck it from the record and gave Savvas an opportunity to refile a compliant brief.  (ECF 71.)  Savvas refiled the motion, seeking sanctions for Willmore's "abuse of the judicial process for improperly accessing and downloading documents inadvertently disclosed" by Savvas that Willmore's counsel recognized as privileged and "for engaging in costly and abusive discovery practices."  (ECF 72.)  Savvas asked the court to dismiss Willmore's case or, alternatively, to impose evidentiary sanctions in the form of clawing back about 130,000 pages of documents that Savvas claimed Willmore had improperly accessed— essentially, the first batch of documents Savvas had produced in response to RFP No. 7.  (*Id.*) Apparently, while Savvas was in the process of re-running the searches, it gave Willmore shared access to the DISCO database where those documents were stored, and things went awry with the vendor.  (*Id.*)  Willmore, instead of simply responding to the motion, filed a motion to strike the motion for sanctions on the grounds that it did not comply with several procedural requirements. (ECF 75.)  The court denied the motion to strike, explaining that Willmore could raise those arguments in response to the motion for sanctions.  (ECF 77.)

### 3.  Deposition Troubles Begin: The Lippe Deposition

While briefing on the above motions was underway, discovery formally closed on Friday, August 11.  Deposition troubles began four days later, on August 15.  That day, Willmore deposed

Savvas Senior Vice President James Lippe, who approved the decision to terminate Willmore's employment.[2]  During the deposition, the parties emailed the court about problems they were having.  Staff responded, explaining that the undersigned was out of the office, but would be happy to schedule something upon return.  Shortly after 7:00 p.m. that evening, Savvas's counsel sent a follow up email explaining that Plaintiff's counsel refused to stop questioning the witness after seven hours, and that Savvas planned to file a Rule 30(d) motion seeking a protective order from further questioning of this witness.  The court set a discovery conference the following week.  (ECF 79.)

The court asked the parties to submit, in advance of the discovery conference, the deposition transcript with the problem areas highlighted.  The court reviewed those portions in preparation for the discovery conference on August 24 to discuss counsels' conduct at the deposition.  The court explained that, at a high level, "I think you're both partly right." (ECF 106, at 7-8.)  The court then offered its observations on the specific portions that Savvas's counsel wanted to address.  The first issue was Plaintiff's counsel asking the witness to retrieve documents.  The court explained that Savvas's counsel "handled that fine" because that is not really a question; it is a document request.  (*Id.* at 8-9.)  In another portion, Plaintiff's counsel asked Lippe questions about a document retention policy that he testified he had never seen before, but Plaintiff's counsel kept asking questions about it anyway, in response to which Savvas's counsel threatened to terminate the deposition.  (*Id.* at 10-11.)  The court explained that Federal Rule of Civil Procedure 30(d) is an available remedy to terminate a deposition but that an attorney would be "rolling the dice" on whether the line of questioning is sufficiently harassing that it is worth terminating the

---

[2] The court did not extend August 11 discovery completion deadline.  This deposition (and others) took place after that deadline by agreement of the parties.

deposition, and in this particular instance the witness "did a pretty good job of holding up against the questioning."  (*Id.*)  Lastly, Savvas's counsel wanted to confirm that depositions are limited to seven hours, which the court confirmed is correct.  (*Id.* at 11-12.)

The court then addressed the specific portions Plaintiff's counsel wanted to address.  First, Plaintiff's counsel turned to Savvas's counsel's objections that were beyond "Object to form" and portions where Savvas's counsel instructed the witness not to answer.  (*Id.* at 13-20.)  The court explained that some of Savvas's counsel's objections early in the day were "probably inappropriate," but that the court "didn't see too much of that other than where I felt like [Savvas's counsel] got sort of rankled about questioning that was improper frankly"—such as badgering the witness to answer questions for which he lacked foundation, cutting off the witness when he was trying to answer a question with a more fulsome explanation, and questioning the witness about producing certain documents where he added the qualifier "if the judge told you to."  (*Id.* at 19-21 ("it's the way that you asked it with sort of the threat and intimidation if the court ordered you to do so").)  The court also addressed Plaintiff's counsel's concerns about questioning the witness about the document retention policy and a job posting—both of which the witness had testified he was not familiar with.  The court explained that it is fair game to explore the witness's knowledge, but "once you feel like you have exhausted the witness's knowledge, for example, they just don't know things, it just is what it is."  (*Id.* at 21-23 ("it doesn't help to try to put words in their mouth with documents they haven't seen or aren't familiar with").)

Lastly, the court addressed the parties' dispute about whether the deposition should be reconvened.  Plaintiff's counsel had exceeded seven hours on direct questioning.  After Savvas's counsel asked his questions, Plaintiff's counsel wanted additional time for redirect, but Savvas's counsel refused.  On this, the court remarked that sometimes depositions run beyond the seven

hours by agreement of the parties, and that Plaintiff's counsel would have been entitled to redirect if he was not out of time, but "in this instance you're just out of time." (*Id.* at 25-27.)

Throughout the discovery conference, the court repeatedly emphasized its main concern about protecting the witness from the lawyers' arguments, as well as abusive conduct toward the witness. (*Id.* at 15 ("[M]y main concern on a situation like that is really to protect the witness from . . . having to endure the [rigors] of deposition training that lawyers should be handling and forcing them to sit there and be subject to abuse between the lawyers."), 16 ("badgering him to answer a question where he didn't have foundation to answer the question"; observing that the witness seemed like he was "trying to be honest and forthcoming" but that sometimes the witness felt like he needed to provide a more fulsome explanation "and you cut him off"), 17 ("you didn't need to be coming at him like that"), 19-20 ("I expect lawyers to be courteous to witnesses"), 26 ("seven hours is a pretty hardcore limit . . . . I think that is just a lot to put any witness through frankly").)

At the conclusion of the conference, the parties stated they did not intend to pursue motion practice concerning Lippe's deposition. (*Id.* at 28.)  And, in view of ongoing discovery by agreement of the parties, the court extended the pretrial order submission deadline to September 8 and the pretrial conference to September 19 in order to allow the parties time to finalize discovery before the pretrial deadlines. (*Id.* at 30-31.)

### 4.  Discovery Troubles Continue: The Debiak Deposition & Plaintiff's Belated Rule 26 Disclosures

The parties' deposition disputes did not end there.  The next day, on August 25, Savvas filed a motion to quash the deposition of Savvas in-house counsel Debiak. (ECF 88.)  The court denied the motion sua sponte because (1) Savvas did not timely file its motion within the 30-day deadline in D. Kan. Rule 37.1(c); (2) Savvas did not adequately meet and confer with Willmore

before filing the motion as required by D. Kan. Rule 37.2; and (3) Savvas did not request a

discovery conference before filing the motion as required by D. Kan. Rule 37.1(a).  (ECF 93.)

The next day, Savvas contacted the court for another discovery conference, which the court

convened on August 31.  (ECF 95-96, 98-99.)  This time, the parties raised three issues, the first

of which was the Debiak deposition.  The parties were unable to resolve their disputes over this

deposition in view of Savvas's overriding concern that Plaintiff's counsel's depositions of Savvas

witnesses had continued to be abusive, harassing, and lengthy:

> I would say there is a real concern for disruption and harassment
> in this case.  We've already seen three depositions either reached,
> surpassed, or get very close to the seven-hour limit . . .
>         . . . .
> I mean, I don't think any of us could appreciate the fact that these
> depositions are taking the turn that they're taking.  I mean, these
> witnesses are being harassed, they're being badgered, and they're
> getting strung out to a seven-hour mark on repeat question after
> repeat question after repeat question.

(ECF 114, at 5-12.)

Savvas also raised the issue of supplemental Rule 26 disclosures that Willmore had

belatedly served on August 14, which consisted of about 30 pages of Willmore's handwritten diary

and calendar entries from 2020 and 2021.  (*Id.* at 20-21.)  Savvas argued it was not fair that it

received these months after Savvas had taken plaintiff's deposition on May 19, after the initial

supplemental disclosure deadline had passed 40 days before the close of discovery, and after the

close of discovery on August 11.  So Savvas asked that these supplemental disclosures either be

excluded from evidence or that Savvas be allowed to reopen Willmore's deposition to ask her

questions about the documents.  (*Id.*)  When the court asked Plaintiff's counsel why he produced

these disclosures so late, he rationalized that he had made them "available for inspection" in March

by producing a photo of some spiral-bound-type books with a Bates stamp, which he thought was

11

sufficient.  (*Id.* at 21-23.)  But when discovery closed and Savvas had never come to inspect the notebooks, and after Savvas started saying that Willmore falsified Salesforce entries, Plaintiff's counsel served the supplemental Rule 26 disclosure because he wanted to use the documents at trial to show that she did have client communications.  He called this "impeachment" evidence.  (*Id.* at 23.)  The court explained the difference between making documents available for inspection under Rule 34 versus affirmatively producing them under Rule 26(a) if they are something a party intends to use, which is not "impeachment" evidence.  (*Id.* at 23-24 ("you don't impeach your own client hopefully on a good day").)  So the court said that Savvas's request that Willmore either be precluded from using these documents at trial or be allowed to reconvene Willmore's deposition at her expense seemed fair, but Plaintiff's counsel would not agree to this.  (*Id.* at 24-29.)[3]

At the conclusion of this discovery conference, the court set a briefing schedule on these issues because the parties did not agree that they were resolved.  (ECF 98.)  And because the case was at a standstill at this point over what discovery remained, the court vacated the deadline for the parties to submit a proposed pretrial order, the pretrial conference setting, and the deadline to file potentially dispositive motions.  (*Id.*)

## 5.  **The Court's Rulings on Discovery Motions**

On September 19, the court issued a memorandum and order granting Willmore's motion to compel as to RFP No. 4, as narrowed to Salesforce documents and communications for the Derby and Blue Valley accounts.  *See Willmore v. Savvas Learning Co*, No. 22-2352-TC-ADM,

---

[3] Savvas also raised concerns during this discovery conference about the belated deposition of Willmore's former supervisor, Mica Lesser, because it was concerned about the potential for harassment.  (ECF 114, at 12-20.)  But the court explained that Plaintiff's counsel was entitled to explore Lesser's knowledge unless it rose to the level of being harassing and abusive, in which case Savvas could "come to the court like we discussed the last time to seek an order terminating the deposition."  (*Id.* at 18-20 (also explaining that a motion to quash the plaintiff's supervisor's deposition in an employment case probably would never hold up under Tenth Circuit precedent).)

2023 WL 6124045, at *6-*8 (D. Kan. Sept. 19, 2023).  The court pointed out that "anything relating to her 'service and business interactions' with those school districts is responsive, not just the few select interactions that Savvas claimed supported its decision to terminate her."  *Id.* at *7. The court therefore ordered Savvas to produce the responsive documents from Salesforce or allow Willmore to inspect the database.  *Id.*

    But the court denied Willmore's motion to compel as to the batch of documents Savvas had withheld from its production in response to RFP No. 7.  As explained above, this RFP asked Savvas to run certain search criteria, in response to which Savvas withheld documents from its CEO concerning company-wide furloughs, company-wide salaries, and non-Kansas employees and customers—all on the grounds that they were not relevant.  *Id.* at *8-*9.  The court explained that "Willmore cannot simply bypass a relevance review by requesting that Savvas run broad search terms and produce all documents that hit on those terms"; Savvas had properly lodged a relevancy objection; and the documents Willmore sought to compel were not relevant.  *Id.* at *9-*10.  The court also rejected Willmore's argument that Savvas was required to provide a relevancy log, explaining that the Federal Rules contain no such requirement and that Willmore's reliance on another district judge's ruling giving the defendant in another case an opportunity to provide a "relevancy log" was not binding and also distinguishable.  *Id.* at *10.  Lastly, the court denied Willmore's request for sanctions.  *Id.* at *11.

    In the same order, the court denied Savvas's motion for sanctions based on the parties' shared use of the DISCO database while Savvas was trying to rectify its initial production in response to RFP No. 7.  *Id.*  Savvas had not supported its request for the extraordinary sanction of dismissal and the court found that "both parties are equally culpable for any debacle concerning their shared use of the DISCO database and the resulting lack of clarity" that led to Willmore's

counsel viewing some documents marked as privileged. *Id.* The court also denied Savvas's alternative request for evidentiary sanctions in the form of a clawback of the first set of documents it produced in response to RFP No. 7. *Id.* The court noted that Savvas's "attempt to lay blame on Willmore for the debacle surrounding its first production is not well taken" given that "Savvas significantly delayed in making that first production, placing Willmore's counsel in a time crunch to prepare for then-upcoming depositions" and then botched the production and its first attempt to rectify the production via a shared database that allowed opposing counsel to view documents that Savvas had marked as privileged. *Id.* By that time, Willmore was able to use the replacement production that Savvas had made, so if Savvas was still concerned about Willmore retaining specific documents from the initial production, it was required to use the clawback procedure set forth in the protective order. *Id.*

On October 31, the court issued a memorandum and order on the issues that had come up during the August 31 discovery conference concerning (1) the Debiak deposition, and (2) Willmore's belated supplemental Rule 26 disclosures. *See Willmore v. Savvas Learning Co., LLC*, No. 22-2352-TC-ADM, 2023 WL 7157533, at *1 (D. Kan. Oct. 31, 2023), *superseded by memorandum and order nunc pro tunc*, 344 F.R.D. 546 (D. Kan. 2023). As to the Debiak deposition, the court denied Savvas's motion to reconsider the court's decision refusing to entirely quash the deposition. *Willmore*, 344 F.R.D. at 553-55. Among other things, the court noted that "[t]he 30-day rule has been a staple in the District of Kansas's discovery procedures for decades. There is nothing manifestly unjust about holding parties to it." *Id.* at 555. However, the court found that Savvas had complied with the 30-day rule as to its alternative request for a protective order seeking to place a shortened time limit on Debiak's deposition because that relief was prompted by Plaintiff's counsel's behavior during depositions of Savvas witnesses from August

15 (Lippe) through September 5 (Lesser). *Id.* at 555-56. Savvas argued these depositions were longer, more contentious, and more duplicative than Savvas expected, with Plaintiff's counsel engaging in tactics to prolong the depositions to a full seven hours, including angry outbursts and repetitive questions. *Id.* The court said it was not necessarily persuaded the depositions were quite as abusive as Savvas portrayed them, but the court credited Savvas's explanation that its request to place time limits on Debiak's deposition was designed to address what Savvas perceived to be Plaintiff's counsel's abusive deposition tactics, which Savvas had only recently come to learn about during depositions within the 30 days prior. *Id.* at 556 (recapping the court's concerns during the discovery conference "about Willmore's counsel's lack of courtesy and professionalism toward the witness"). The court found good cause to grant Savvas's alternative request for a protective order placing a time limit on the deposition. The court reasoned that Willmore already had "ample opportunity" to depose the three individuals involved in the decision to terminate her employment (Lippe, Lesser, and HR Rep Jolcover), much of the testimony suggested that Debiak was involved in those discussions "largely (if not solely) in her capacity as legal advisor," and Debiak probably had very little relevant, non-privileged information that she could share at a deposition. *Id.* at 556-60. The court also rejected Willmore's argument that Savvas had waived privilege about Debiak's decisions, advice, and communications—an issue that would "inevitably come up during Debiak's deposition." *Id.* at 560-61. The court therefore placed a presumptive one-hour limit on the deposition and said the court would observe the deposition live in order to be prepared to make rulings on any privilege disputes that might arise and to be available to make a ruling on any oral motions by the parties to terminate or extend the deposition after one hour. *Id.* at 556-61.

The court also granted Savvas's motion as to Willmore's supplemental Rule 26(a) disclosures, which were clearly untimely and intended to be used substantively at trial to prove her

discrimination claims, not solely for impeachment purposes. *Id.* at 561-65. The court therefore directed Willmore to elect her sanction: either (1) she is precluded from using the documents at trial, or (2) Savvas is allowed additional deposition time to question her about the documents, with Willmore reimbursing Savvas for its costs for the continued deposition. *Id.*

On November 14, Willmore filed objections to this memorandum and order. (ECF 115.) The district judge overruled the objections two days later, noting that there appeared to be "good reason to suspect the Magistrate Judge's presence [at Debiak's deposition] would be beneficial," and that "the Magistrate Judge's sanction for untimely disclosures aligns with those prescribed by Fed. R. Civ. Pro. 37(c) and Tenth Circuit precedent." (ECF 118.)

With the court having resolved the issues concerning the contours of what discovery remained, the court put the case back on track by re-setting the proposed pretrial order deadline and the pretrial conference for December 11 and 21, respectively. (ECF 117, 121-122.)

### 6.  The Debiak Deposition

After the pretrial conference on December 21, the Debiak deposition proceeded via Zoom that afternoon. The court observed the entire deposition. It went well beyond the presumptive one-hour limit and Savvas made an oral motion to terminate the deposition. The court heard from both parties and then granted the motion "consistent with the opinion – my observations previously" (ECF 132-1, at 85)—meaning, the court's October 31 order placing a presumptive one-hour limit on the deposition. The court explained that Willmore had "a full and fair opportunity to examine" Debiak to explore her personal involvement in the events in question, so the court granted Savvas's motion to terminate the deposition. (*Id.* at 85-86.)

But Willmore persisted. She filed a motion to reconsider the court's order terminating Debiak's deposition. (ECF 124.) The court denied the motion for the exhaustive reasons already explained in the court's memorandum and order placing a presumptive one-hour limit on the

deposition, as well as the court's observations at the end of Debiak's deposition.  (ECF 127.)  The court concluded that "Willmore's counsel has already had ample time with Debiak as a witness and the court will not require her to endure more."  (*Id*. at 4.)  Plaintiff's counsel then filed objections with the district judge, which the court overruled the next day.  (ECF 132, 133.)

###### B.   ANALYSIS

###### 1. Legal Standard

Section 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  In *Braley v. Campbell*, 832 F.2d 1504 (10th Cir. 1987) (en banc), the Tenth Circuit articulated the standard for imposing attorney's fees and costs personally against an attorney under § 1927.  *See Miera v. Dairyland Ins. Co*., 143 F.3d 1337, 1342 (10th Cir. 1998).  The Circuit rejected a subjective good faith inquiry and concluded, instead, that sanctions under § 1927 are warranted only when the conduct "viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."  *See id*. (quoting *Braley*, 832 F.2d at 1512).  This standard is then used to decide whether "by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law," an attorney subjects himself to sanctions under § 1927.  *Id*. (quoting *In re TCI Ltd*., 769 F.2d 441, 445 (7th Cir. 1985)).  Sanctions are appropriate under § 1927 when an attorney is "cavalier or 'bent on misleading the court'"; when an attorney "intentionally acts without a plausible basis"; "when the entire course of the proceedings was unwarranted"; or when "certain discovery is substantially unjustified and interposed for the improper purposes of harassment, unnecessary delay and to increase the costs of the litigation."  *See id*. (citations omitted).  Finally, because § 1927 is "penal in nature" and represents "an extreme standard," an award of sanctions should only be made "in instances evidencing serious and standard disregard

for the orderly process of justice, lest the court dampen the legitimate zeal of an attorney in representing his client." *Obeslo v. Empower Cap. Mgmt., LLC*, 85 F.4th 991, 1005 (10th Cir. 2023) (internal quotations omitted).

### 2. <u>Sanctions Are Not Warranted under § 1927 for Plaintiff's Counsel's Continued Pursuit of the Litigation After February 3, 2023</u>

Savvas contends that Plaintiff's counsel unreasonably and vexatiously multiplied the proceedings when he refused to dismiss the case after Savvas provided early discovery showing it had legitimate, nondiscriminatory reasons for firing Willmore. (ECF 146, at 1 (complaining that Willmore "filed her lawsuit on far-reaching claims of age and gender discrimination, asked for proof that debunked her theories, and then proceeded with frivolous, unreasonable, and vexatious litigation, ignoring the evidence she specifically requested").) The court does not find that Willmore's continued pursuit of the litigation evidences a serious disregard for the orderly process of justice. Although Savvas provided Rule 26 disclosures and internal documents early in the case showing it terminated Willmore's employment for poor performance and insubordination, the court is unpersuaded that her counsel intentionally acted without a plausible basis when he refused to dismiss the case after receiving those documents or that the entire course of the proceedings thereafter was unwarranted. He was entitled to proceed with discovery to investigate Willmore's claims and explore Savvas's defenses. Indeed, it is typical in an employment discrimination case for the defendant to provide discovery showing legitimate, nondiscriminatory reasons for firing the plaintiff, and for the plaintiff to try to explore whether the proffered reasons were a pretext for discrimination. That is what discovery is for.

Savvas argues that "[i]t was clear once Savvas produced its first round of internal documents that Plaintiff's claims were meritless." (ECF 146, at 7.) The court disagrees. Savvas's Rule 26 disclosures and documents did not conclusively show that Willmore's claims were

meritless and could not succeed.  If that had been the case, the proper remedy would have been for Savvas to have given notice of a Rule 11 violation, demand that Willmore dismiss her case, and, if and when she refused to do so, file the Rule 11 motion.  But Savvas did not do that.  The pretrial order entered after the close of discovery reflects that each side has a plausible narrative to support its legal theories.  (ECF 125.)  Whether the factual record ultimately supports Willmore's view of the events sufficient to survive summary judgment and/or prevail at trial presents a separate issue. But the court certainly cannot find based on the current record that Plaintiff's counsel had no plausible basis to continue to pursue the case for Willmore.

The case has not been resolved in Savvas's favor as of the time of this order, and Savvas has not demonstrated that Plaintiff's counsel continued to pursue claims that had no merit or were no longer reasonable.  Therefore, the court does not find that sanctions under § 1927 are warranted at this procedural juncture for Plaintiff's counsel's continued pursuit of the litigation after February 3, 2023.  *Cf. Dreiling v. Peugeot Motors of Am., Inc.*, 768 F.2d 1159, 1165-66 (10th Cir. 1985) (upholding sanctions against attorney who continued to assert bogus claims "long after it would have been reasonable and responsible to have dismissed the claims").

### 3.  <u>Sanctions Are Not Warranted under § 1927 for Plaintiff's Counsel Over-litigating the Case</u>

Savvas further argues that Plaintiff's counsel pursued a "scorched earth approach to litigation." (ECF 146, at 3.)  Savvas argues that the case "became vexatious once Plaintiff became focused on extraneous issues that complicated this otherwise simple, single plaintiff employment case and after it became clear – or should have become clear – that Plaintiff's claim lacked merit." (*Id.* at 7.)  The court agrees with Savvas that Plaintiff's counsel has over-litigated this case.  But the same can be said for Savvas, albeit to a lesser extent.  As demonstrated by the docket sheet and

the court's recitation of this case's procedural history above, both parties committed discovery infractions, and both filed motions that multiplied the proceedings.

For example, Savvas's first motion for sanctions asked the court to impose the sanction of dismissal, but it did not even address binding Tenth Circuit precedent this court would be required to follow if it were to impose the extraordinary sanction of dismissal.  And now Savvas's second motion for sanctions is another example of overkill.  Savvas asks for Plaintiff's counsel to pay the "*excess* costs, expenses, and attorneys' fees incurred because of his unreasonable and vexatious conduct from February 3, 2023, through the present" (emphasis added).  Yet Savvas does not set forth what amount it seeks, or attempt to substantiate that amount with documentation, or even explain what parameters it thinks the court should use to separate out whatever amounts are "excess" versus those that are not.  Such unwieldy motions, which call into question the entire procedural history of this case that both parties have over-litigated, do nothing to further the "just, speedy, and inexpensive determination" of this action.  *See* FED. R. CIV. P. 1.

Ultimately, both parties won some issues and lost some issues—both in how they fared during discovery conferences with the court that resolved issues short of motion practice, as well as in motion practice itself.  Plaintiff's counsel has an obligation to zealously represent his client unless and until the parties resolve the case or it is decided on the merits.  Savvas has not articulated any cogent explanation that persuades the court that his overall conduct has exceeded the bounds of what is allowed by the Federal Rules of Civil Procedure or this court's local rules.

### 4. <u>Sanctions Are Not Warranted under § 1927 for Plaintiff's Counsel's Unprofessional Conduct</u>

Savvas's motion also seeks sanctions for the way Plaintiff's counsel has litigated the case and for the personal attacks on Savvas's counsel and on the court.  (ECF 146, at 4-5.)  On this, Savvas raises a fair point.  This court has adopted the *Pillars of Professionalism* as an aspirational

goal to guide lawyers in their pursuit of civility, professionalism, and service to the public.[4]  Given the contentious nature of this case, the court has had ample opportunity to observe both sides' lawyers' conduct.  If the *Pillars of Professionalism* are to have any meaning, the court feels dutybound to acknowledge the myriad ways in which Plaintiff's counsel's conduct fell short of them—in the way he treated Savvas witnesses during depositions, and in his tone with opposing counsel and the court.  The court has repeatedly brought these shortcomings to his attention in less public settings such as discovery conferences and in more subtle ways in the court's orders, apparently to no avail because he continues to insist that he has done nothing wrong.  The court therefore reluctantly proceeds to describe his conduct in more detail given one overriding principle in the *Pillars of Professionalism* that is particularly apt here: "In all your activities, act in a manner which, if publicized, would reflect well on the legal profession."

### a.      The Lippe Deposition

Plaintiff's counsel has repeatedly insisted that he did not "harass" Savvas witnesses during depositions, so the court begins with a more detailed expository on this point.  As explained above, the discussion during the August 24 discovery conference concerning the Lippe deposition focused on the highlighted portions of the transcript the court had requested from the parties in advance of the conference.  The court later reviewed the entire deposition transcript and became concerned that Plaintiff's counsel's deposition style too often devolved into improper conduct.

The most basic ground rule of a deposition is that it should proceed as the examination of a witness would at trial.  *See* FED. R. CIV. P. 30(c)(1).  "In general, counsel should not engage in any conduct during a deposition that would not be allowed in the presence of a judicial officer."

---

[4] The *Pillars of Professionalism* are available on the court's website, and the court encourages lawyers to review them occasionally to remind themselves of the standards of conduct the court hopes lawyers will hold themselves to.

FED. R. CIV. P. 30 advisory committee notes to the 1993 amendments to subdivision (d).
Furthermore, the *Pillars of Professionalism* expect counsel to "[b]e courteous, respectful, and
considerate."  The court has "authority to maintain standards of civility and professionalism. . . .
Because depositions take place in law offices rather than in courtrooms, adherence to professional
standards is vital, for the judge has no direct means of control."  *Redwood v. Dobson*, 476 F.3d
462, 469-70 (7th Cir. 2007); *see also Bordelon Marine, Inc. v. F/V KENNY BOY*, No. 09-6221,
2011 WL 164636, at *4-*5 (E.D. La. Jan. 19, 2011) ("As officers of the court, counsel are expected
to conduct themselves in a professional manner during a deposition." (quotation omitted)).

Early in the day during the Lippe deposition, Plaintiff's counsel asked Lippe to get a copy
of a job posting from Savvas's HR department.  (ECF 115-4, at 26-27 ("I would ask on a break
that you ask HR to send that to you . . . .").)  Savvas's counsel objected to this on the grounds that
the witness had already testified that he had no knowledge about the job posting and "[w]e're not
going to request . . . documents once discovery is closed through a deposition."  (*Id.*)  This
objection was proper.  The format for examination of a witness, whether in a deposition or at trial,
is question, answer, question, answer, etc.  Instructing the witness to go fetch documents does not
fall within this format.  If counsel wants to request documents, the procedural vehicle to do so is
via a request for production under the Federal Rules of Civil Procedure and/or related dialogue
with opposing counsel concerning the same.

Plaintiff's counsel also occasionally asked questions that were not clear to the witness and,
when the witness would try to clarify his answer, Plaintiff's counsel would scold the witness to
keep his answers short, frequently in combination with threatening to call the court and run late
with the deposition.  (ECF 115-4, at 18-20, 23-25 ("Q. So if I'm correct . . . that the job posting . .
. indicated that . . . applicants needed to have five years of experience . . . A. Well, again I would

need to look at the job posting . . . .Q. Well, what I'm trying to do is avoid getting the judge on the
phone and I'm comfortable that the judge . . . would agree . . . if you can't do that or you don't
want to do that, then . . . we'll have to call the judge and get the judge involved"), 46-48, 49-50,
125-27, 174-78.)  He wasted more time arguing with opposing counsel about this than if he would
have simply accepted the witness's answer and moved on, and yet, early in the day, he used this
debate as an excuse to start threatening to run late with the deposition.  (ECF 115-4, at 47-48 ("MR.
DeMASI: . . . now you're just giving a hypothetical situation 10:19 in the morning about something
later at 5:00 p.m.  So why don't we stick to the questions."), 175-76 ("MR. DeMASI: . . . just
because you don't like his answer doesn't mean you can obstruct him from answering the question.
MR. REAVEY: Are you kidding me? MR. DeMASI: You asked him for the facts that led to his
conclusion that Brenda falsified the sales force records and he's trying to give you an honest
answer and you're cutting him off.").)

Lippe would testify that he had never seen documents or did not know about certain subject
matter, and Plaintiff's counsel would nevertheless proceed to ask him questions about those
subjects or try to put words in Lippe's mouth despite the lack of foundation.  (ECF 115-4, at 27-
28, 137-41, 157-58.)  For example, Plaintiff's counsel asked a series of questions about personnel
files and Savvas's document retention policy—all of which Lippe testified he knew nothing about.
(ECF 115-4, at 158-62.)  Eventually, Plaintiff's counsel resorted to trying to shame Lippe about
his lack of knowledge:

> Q. Mr. Lippe, do you generally view yourself as being an honest
> person?
> A. I do.
> Q. You believe you're credible.
> A. I do.
> Q. You always try to tell the truth under all circumstances?
> A. I do.

> Q.  **Can you understand why someone listening to this
> deposition might view you as almost on every single question you
> are attempting to answer it to spin it** in a way that makes your
> company look better or not that bad?  Isn't that something you're --
> MR. DeMASI:  Object to form.
> A.  Patrick, I can see that you would think that, because it feels
> to me like you're trying to spin it in a different way, and I'm simply
> speaking the truth.

(*Id.* at 163 (emphasis added).)  Plaintiff's counsel's sarcasm demonstrates a lack of courtesy and

respect for the witness's prior answers about his lack of knowledge.  *See United States ex rel.*

*Baltazar v. Freeman*, 302 F.R.D. 256, 262 (N.D. Ill. 2014) (deposing counsel's disrespectful,

sarcastic questions were not appropriate).

Plaintiff's counsel went on and on, asking the witness questions about document retention

for personnel files.  While an attorney is certainly entitled to explore a witness's knowledge during

a deposition, at some point continuing to badger a witness about facts the witness has already

testified he knows nothing becomes intentionally improper deposition questioning.  *See, e.g.*,

*Whiting v. Hogan*, No. 12-CV-08039-PHX-GMS, 2013 WL 1047012, at *6 (D. Ariz. Mar. 14,

2013) ("Repetitive questioning can evince bad faith or a motive to harass the deponent if it is

excessive." (collecting cases)).  Eventually, Plaintiff's counsel complained that "I'm not going to

keep wasting my time, everybody's time on this silly debate that you're trying to create."  (ECF

115-4, at 163.)  Sarcastic commentary like this is unprofessional.  *See Freeman v. Schointuck*, 192

F.R.D. 187, 189 (D. Md. 2000) (deposing counsel's sarcastic comments were unprofessional).

Furthermore, it is improper because a deposition should proceed as the examination of a witness

would at trial (question, answer, question, answer, etc.).  Deposing counsel's commentary has no

place in this format.  *See United States ex rel. Baltazar*, 302 F.R.D. at 267 (ordering that

"[e]xamining counsel shall not characterize or comment on any answer given by a witness").

Plaintiff's counsel injected improper commentary throughout the deposition. (*See, e.g.*, ECF 115-4, at 133 ("Well you'll get a copy of the transcript and you can look at the question I asked that you disagreed with and the very next one that you agreed with and you can see for yourself if those are consistent. . . . You will have that opportunity.").) As a part of this ongoing commentary (not questioning), Plaintiff's counsel repeatedly lectured the witness about what the court would do. (*Id.* at 25 ("I'm comfortable that the judge . . . would agree . . ."), 50 ("If we were at trial in the Court, the judge would tell you . . . ."), 150 ("Again, Mr. Lippe, when the judge calls back, the judge will tell you this as well.").) Plaintiff's counsel obviously is not the court, he does not speak for the court, and he should not have held himself out as such to the witness. This type of commentary is particularly nefarious because its only apparent purpose is to implicitly threaten and intimidate a witness into behaving how the deposing attorney wants him to—as if the deposing counsel somehow speaks for the court. Such conduct lacks courtesy toward the witness and reflects poorly on the legal profession. *See, e.g.*, *United States ex rel. Baltazar*, 302 F.R.D. at 264-65 (threatening the witness and opposing counsel and arguing with the witness and commenting on her answers was inappropriate and unprofessional); *Whiting*, 2013 WL 1047012, at *7 (deposing attorney's threats were counterproductive, unprofessional, and discourteous); *Freeman*, 192 F.R.D. at 189 (deposing attorneys threatening comments were unprofessional).

At one point, Plaintiff's counsel asked the witness if he would produce the Salesforce documents (involved in the then-pending motion to compel) if the court ordered him to do so:

> BY MR. REAVEY:
> Q.  What would one have to do to – if you wanted to – **like the judge told you, look, tomorrow I want you to turn over the sales force records** for the Derby and Blue Valley School Districts, what would that entail doing.
> MR. DeMASI:  Don't answer that. That is highly inappropriate Patrick.
> . . . .

25

> MR. DeMASI:  You were asking the witness if he could produce documents if the judge ordered him to do that.  It is not an appropriate line of question, Patrick.
> MR. REAVEY:  **You fudge and fib and lie.**  That is not –
> . . . . [More back and forth between counsel.]
> A. If the judge told me to do something, I would do my very best to make sure it happened, but I'm not IT. . . .

(ECF 115-4, at 181-82 (emphasis added).)   Plaintiff's counsel's disparagement of opposing counsel ("You fudge and fib and lie.") was obviously discourteous and unprofessional.  It was also factually incorrect because Savvas's counsel reiterated the very question Plaintiff's counsel had asked.  When Savvas's counsel reached out to the court during a break to report that Plaintiff's counsel was using this tactic, Plaintiff's counsel doubled down on denying that he had asked this very question:

> MR. REAVEY: . . . Mr. DeMasi just sent an email to the judge indicating that **I asked the witness if he would produce certain documents if he was ordered by Judge Mitchell to produce them, which is not at all what was asked.**

(*Id.* at 185 (emphasis added).)  But, as is obvious from the above, that is exactly what Plaintiff's counsel asked the witness.

    In the midst of this questioning, Plaintiff's counsel went on a rant about how the deponent's counsel is not allowed to instruct the witness not to answer a question in a deposition.  While this is correct as a general rule of deposition conduct, this was not proper deposition questioning and it was not Plaintiff's counsel's prerogative to school the witness on this point.  (*Id.* at 186 (pulling up the District of Kansas Deposition Guidelines on the computer screen and showing the witness what they say about instructing a witness not to answer a question).)  He was out of line with his myopic fixation on this single deposition rule while disregarding many others.  For example, Savvas's counsel correctly pointed out that "under Rule 30(b) I can protect my client from being harassed by opposing counsel during deposition just what is exactly going on with this line of

questioning." (ECF 115-4, at 186.) Of course, Savvas's counsel would have been entitled to "move to terminate or limit [the deposition] on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party." FED. R. CIV. P. 30(d)(3)(A). Savvas's counsel went on to explain all the ways the witness was being harassed and made it clear that he was going to terminate the deposition if Plaintiff's counsel did not get back to asking appropriate questions. (ECF 115-4, at 186-91 ("MR. DeMASI: I do want to terminate it. If you're not going to act like a civilized attorney and ask him questions regarding the ultimate issues in the case, then I don't want to waste anyone else's time here. . . . go ahead and ask your questions and if I find them inappropriate, I'll make my objections.").)

Ultimately, Savvas's counsel did not terminate the Lippe deposition early, but instead allowed Plaintiff's counsel to question Lippe for more than seven hours. Meanwhile, Plaintiff's counsel showed no respect whatsoever for the seven-hour limit set forth in FED. R. CIV. P. 30(d)(1). Neither the court reporter nor the videographer kept a total accounting of the time on the record. (ECF 115-4, at 257, 263.) When Savvas's counsel expressed concern that the deposition was approaching the seven-hour mark, Plaintiff's counsel snarked that "[n]obody's going to turn into a pumpkin." (*Id.* at 163.) After Savvas's counsel finished asking Lippe questions, Plaintiff's counsel wanted to ask the witness follow-up questions, but Savvas's counsel shut down the deposition on the grounds that Plaintiff's counsel had already exceeded his time limit:

> MR. REAVEY: . . . I have a few follow-up.
> MR. DeMASI: No, you don't. You already exceeded your time limit, Patrick. And we can take this up with the Court when we discuss it with them on the 24th.
> . . . .
> MR. REAVEY: Okay. And what is the basis of you ending the deposition.
> MR. DeMASI: Because you've already exceeded your time limit and any further questioning at this point is meant to harass the witness.

. . . .

    MR. DeMASI:  This deposition is over, Patrick.

    MR. REAVEY:  By whose authority?  By whose authority is this deposition over?

    MR. DeMASI:  The Court's.  So I will . . . explain to the Court that there is no legitimate basis for you to even exceed the seven-hour mark and you've already exceeded it. . . . .

    MR. REAVEY:  In response you think if we were in Court and you asked the witness an hour worth of questions, you really think the judge – **I don't know if you've ever been in Court**, but you think the Judge would prohibit the other persons [sic] attorney from any follow-up questions?  I never happened but.

    MR. DeMASI:  Patrick, this deposition is over.

(*Id.* at 306-09 (emphasis added).)  Again, Plaintiff's counsel's attempt to belittle Savvas's counsel ("I don't know if you've ever been in Court") was rude and unjustified.  And this comment is particularly troubling because Plaintiff's counsel exalts himself as having litigated employment cases "for nearly thirty years" (ECF 147), whereas Savvas's attorney defending the deposition is a much more junior member of the legal profession.  The court would hope that Plaintiff's counsel's years of experience would have cultivated in him a level of professionalism and courtesy that would serve as an example to younger lawyers.  Instead, he demonstrated the opposite.

    Meanwhile, Savvas's counsel's position about the seven-hour limit complied with the rule that limits a deposition to a single day of seven hours on the record "[u]nless otherwise stipulated or ordered by the court."  FED. R. CIV. P. 30(d)(1); *see also* Rule 30 advisory committee notes to the 2000 Amendments ("[T]he only time to be counted is the time occupied by the actual deposition.").  It is not uncommon for counsel to stipulate to go beyond this seven-hour limit for various reasons, but nothing in the rule requires such a stipulation.  Nor did anything in the rule require Savvas's counsel to respond to Plaintiff's counsel attempt to bait him into an argument about why Savvas's counsel was ending the deposition.  The moment the deposition hit seven hours on the record, Savvas's counsel was entitled to walk out of the room with Lippe without

providing any further explanation.[5]  (ECF 106, at 12 ("THE COURT: . . . I'm hardcore on that for what it's worth."), 26-27 ("I think that's a lot to put any witness through frankly.  They're just not lawyers who are wired like we are to endure these marathon depositions.  For a lot of witnesses it's just very exhausting, and I just don't think it's fair to bring a witness back . . . beyond that seven hours unless there is a real reason to do so and to put the witness through additional time, and in this instance, my goodness, he sat through a lot.").)  Plaintiff's counsel was not entitled to additional time unless and until he obtained a court order allowing additional time, which he did not.  His argument to the contrary was frivolous and demonstrated a lack of respect for everyone else involved in the deposition.

On balance, the court's observations about Plaintiff's counsel's conduct during the Lippe deposition fall somewhere in the following vicinity:

> No one expects the deposition of a key witness in a hotly contested case to be a non-stop exchange of pleasantries.  However, it must not become an excuse for counsel to engage in acts of rhetorical road rage against a deponent and opposing counsel . . . .  While isolated acts of discourtesy or loss of temper can be expected, even from the best of counsel, and excused by the court, systemic and deliberate abuses . . . cannot go unsanctioned as they are destructive of the very fabric which holds together the process of pretrial discovery—cooperative exchange of information without the need for constant court intervention.

*Freeman*, 192 F.R.D. at 189-90.

### b.    Plaintiff's Counsel's Ongoing Abuse Toward Opposing Counsel

Plaintiff's counsel's disparagement of Savvas's counsel did not end with the Lippe deposition.  As but another example, the parties agreed to conduct limited discovery after the pretrial order was entered.  Specifically, Willmore deposed Jasjit S. Arneja on January 8, 2024, in

---

[5] The court does not encourage this as a routine practice in depositions that are conducted with more civility.  But, here, the atmosphere of the deposition had already gone off the rails and Plaintiff's counsel had clearly signaled that he did not intend to respect the seven-hour limit.

his capacity as a Rule 30(b)(6) designee for Savvas on selected document preservation topics.  By

the end of that deposition, Plaintiff's counsel resorted to calling Savvas's counsel names:

> MR. REAVEY:  So, Alex, why isn't that document on this privilege log?
> MR. DeMASI: I don't know.  Good chance that I typo'ed it, but move on, Counsel.
> MR. REAVEY:  You don't tell me what to do.
> MR. DeMASI:  Okay.  Then you don't tell me what to do.
> MR. REAVEY:  I asked you a question.  **You don't have to be a smart aleck.**
> MR. DeMASI:  It's not my deposition.  If you have a question - -
> MR. REAVEY:  Don't be a –
> MR. DeMASI:  You and I can talk off the record.
> MR. REAVEY:  -- **smart aleck**.
> So you don't have --
> MR. DeMASI:  (Indiscernible.) inappropriate, Patrick.
> MR. REAVEY:  You don't have any explanation for why that document is not on the privilege log?
> MR. DeMASI:  I don't at the moment, Patrick.  You and I can have a discussion off the record.

(ECF 139-2, at 54 (emphasis added).)  This name-calling was discourteous and unprofessional.

But Plaintiff's counsel's attacks continued, and got even worse:

> MR. DeMASI:  Object to the form of the question.  Are you asking him to fact check my email to you back in March of this year?
> MR. REAVEY:  Again, object to form, that's it.  **Don't need your smart aleck responses.**
> MR. DeMASI:  Okay --
> MR. REAVEY:  **It may make you feel smart or cute, or whatever,** but it doesn't here, so just --
> MR. DeMASI:  Well, I think you're wasting the witness's time asking him if you read my words correctly.  **I'm not a fact witness to this case, Patrick.**
> MR. REAVEY:  **Not yet.**
> MR. DeMASI:  **Oh, are you going to depose me?**
> MR. REAVEY:  **Well, that'd be – that'd be a lot of fun.**
> MR. DeMASI:  We would have a great time, Patrick, but let's go back to questions.
> MR. REAVEY:  **The less time I have to spend with you the better for sure.**
> MR. DeMASI:  Thanks Patrick.

(*Id.* at 71-72 (emphasis added).)

Savvas also points to Plaintiff's counsel's emails that made unsubstantiated, flagrant personal attacks on Savvas's counsel. Specifically, Willmore's reply to her motion to compel (discussed below) touts an order from the Jackson County Circuit Court dated January 18, 2024,[6] in which the court found that the defendants in that case (not Savvas), who also happened to be represented by the same counsel as Savvas in this case, failed to preserve evidence. (ECF 144, at 3; ECF 144-1.) After a discovery conference in this case on January 25, Plaintiff's counsel sent the following intemperate email to Savvas's counsel at 6:39 p.m. that evening:

> Shame on you guys for trying to cover up spoliation, AGAIN! I'm familiar with the false representations and filings you made in the Jackson County litigation, continually trying to cover up your client's misdeeds and failure to preserve evidence. The judge nailed you in that case with sanctions, and **I will be doing everything in my power to expose you in this case as well,** even if that means an appeal to the Tenth Circuit!
> . . . .
> Pretty amazing stuff but not at all surprising!

(ECF 146-4 (emphasis added).) Willmore's reply then goes on to argue essentially that, because the Jackson County Circuit Court found that the defendants in *that* case failed to preserve evidence, this court should likewise find that Savvas failed to preserve evidence in *this* case. (ECF 144, at 3.) But Willmore's reliance on that order (ECF 144-1) is misplaced for multiple reasons. For one, the fact that Savvas's counsel may have represented another client in another case that another court found did not properly preserve evidence does not make it more or less likely that Savvas spoliated evidence in this case. Savvas either spoliated evidence in this case or it did not. Second, in the Jackson County Circuit Court order, the court found that the defendants in that case did not

---

[6] Notably, this order was issued ten days after the Arneja deposition and a week before the discovery conference on January 25.

preserve evidence that they should have, but it says nothing to support Willmore's accusation that defendants' counsel (Savvas's counsel in this case) did anything wrong—*i.e.*, anything other than represent their client. Plaintiff's counsel's attempt to vilify Savvas's counsel by threatening to go on a relentless tirade in pursuit of sanctions reflects extremely unprofessional behavior. And it was not his only unhinged email rant on opposing counsel. (*See also* ECF 146-10.)

### c. Plaintiff's Counsel's Complaints About the Court

Savvas also points to Plaintiff's counsel's objections and appeals to the district judge of the undersigned's orders. (ECF 115, 132.) On this, Savvas also raises a fair point, although not because of the objections *per se*. A party certainly has the prerogative to file objections to a magistrate judge's discovery orders and also to preserve issues for appeal. But the *Pillars of Professionalism* instruct that counsel should "[t]reat judges and court personnel with courtesy, respect, and consideration" and "[a]ccept all rulings, favorable or unfavorable, in a manner that demonstrates respect for the court, even if expressing respectful disagreement with a ruling is necessary to preserve a client's rights." Plaintiff's tone toward the court fell short of this standard on more than one occasion.

Given Plaintiff's counsel's disrespectful behavior toward witnesses and opposing counsel, the court was not surprised when he began demonstrating similar behavior toward the court. For example, when Plaintiff's counsel filed objections to the court's October 31 memorandum and order placing a presumptive one-hour limit on the Debiak deposition, and also granting Savvas's motion to strike or exclude Willmore's late-disclosed Rule 26(a) disclosures, his objections to this order took aim at the court. (ECF 115.) For example, he complained that the presumptive one-hour limit on the Debiak deposition was "intended to be punitive" and that the court attending the deposition was a "gratuitous measure" (an ironic complaint when he previously had been so eager

32

to involve the court in depositions).  He went on, complaining that several of the court's observations and unfavorable rulings reflected "unfair treatment and seemingly a personal issue the Magistrate has with undersigned counsel."  (*Id.* at 9.)  The district judge overruled that objection two days later, noting that Willmore's objections failed to "point to any particular area of concern . . . that might support such a personal attack on the Magistrate Judge" and that "[a]d hominem attacks are not legal arguments; they create no grounds for review."  (ECF 118, at 3.)

Plaintiff's counsel's backlash persisted after the Debiak deposition, which the court observed in its entirety.  He had insisted he needed Debiak's deposition because she was involved in the decision to terminate Willmore's employment.  (ECF 115-1, at 7-8.)  Yet he made the strategic decision to squander what limited time the court allowed.  He spent nearly the entire first hour of the deposition largely asking Debiak broad questions about company HR policies and guidelines; her role as Savvas's compliance counsel, employment counsel, and affirmative action officer with the EEOC; and her interpretation of the scope of attorney-client privilege.  (ECF 127-1, at 4-30.)  Near the end of the first hour, he asked her a series of questions about Willmore's Salesforce records, which actually are an issue in this lawsuit.  (*Id.* at 30-34.)  He then spent much of the rest of the time reading from documents and emails that predominantly involved other Savvas witnesses that Willmore had already deposed.  (*See, e.g.*, *id.* at 32 ("Did I read that correctly?" … "Have you seen this document before? A: I don't think I have."), 33-34 ("Did I read that correctly?  A: Yes."), 36 ("Did I read that correctly?  A: Yes."), 38 ("Do you agree that's how that sentence starts?  A: That's what it says."), 42-43 ("Did I read that correctly?  A: You did.  Q: . . . And you agree . . . he indicates . . . correct? A: That's what it says. . . . Q: . . . Did I read that correctly? A: Yes."), 44 ("Did I read that correctly?  A: You did."), 45 ("Yes, it says what it says."), 49 ("And then there's 4 bullet points – questions, correct? A: Yes. Q: Okay. . . . And the first bullet

point is . . . Did I read that correctly?  A: Yes."), 51 ("And then the second bullet point . . . Did I read that correctly? A: Yes."), 64 ("You did read it correctly. . . . That's what it says."), 66 ("Did I read that correctly? A: Yes. Q: Okay.  And so . . . A: That's what it says."), 70 ("Did I read that correctly?  A: Yes.").)  He also spent his time asking Debiak about deposition testimony from other witnesses, with which she was unfamiliar.  (*See, e.g.*, *id.* at 11-12 ("Are you familiar with testimony in this case that . . . A: No. I'm not familiar with that testimony."), 13 ("Are you familiar with Savvas's testimony, through Sheri Jolcover, that . . . A: No."), 50 ("Are you familiar with Mica Lesser's testimony that . . . A: No, I'm not familiar with Mica's testimony."), 72 ("Are you aware of that testimony by him? A: No."), 73 ("So you – you believe her testimony would be . . . A: I don't know what – what her testimony was.").)

Ultimately, it was clear to the court that Debiak's involvement was limited to legal consultation based on what Lesser, Lippe, and Jolcover told her.  (*Id.* at 55 ("I've never met Brenda before."), 58-59 ("Like I said, I had never met Brenda Willmore, did not know anything about her. . . . So we discussed Mica's termination request."), 67 ("I don't know what he said to her.  All I know is what the email says."), 69 ("[L]ike I said, I never met Brenda Willmore, did not know anything about her.  I was not involved in any conversations with her."), 71 ("And who made that decision [to fire Willmore]?  A: It was Mica Lesser with James Lippe."), 73 ("Sheri Jolcover was part of those discussions; correct? A: Yes.").)  And the court had already determined that Savvas did not waive attorney-client privilege with respect to those communications.  *See Willmore*, 344 F.R.D. at 560-61 ("Accordingly, the court will expect Willmore's counsel to respect Savvas's assertions of attorney-client privilege during the deposition.").  So, there was nothing further for counsel to explore with respect to Debiak's involvement in Willmore's termination.

Near the end of the deposition, Plaintiff's counsel was just reading from other people's documents. (*See, e.g.*, ECF 127-1, at 79 ("[Y]ou agree the bullet point that Sheri provided to Mica indicates . . . True? A: Okay. That's what it says. Q: All right. And then the next bullet-point Sheri wrote for Mica . . . Did I read that correctly? A: Yes, you did. Q: And then the next bullet point says . . . Did I read that correctly? A: Yes. Q: And the next bullet point . . . Did I read that correctly? A: Yes. Q: All right. And then the next bullet point . . . Did I read that correctly? A: Yes. Q: Okay. And then the next bullet point indicates . . . correct? A: You read it correctly, yes."), 80-83 ("You read it correctly, yes."; "that's what it says on the May 18th email"; "I did not write this, so I don't know."; "Well, the words say what they say."; "That's what it says, yes.").)

By that time, the deposition had already significantly exceeded the presumptive one-hour limit, and Savvas made an oral motion to terminate the deposition. The court heard from both parties briefly and then granted the motion. The court explained as follows:

> I do appreciate that Ms. Debiak had some involvement in the events in question. That's why I find it quite surprising that – Mr. Reavey, that you spent the bulk of the time here today asking her . . . [far-afield] questions. I think you could have easily explored her personal involvement in answering . . . the questions that you had on that front.
> You've had a full and fair opportunity to examine her. You knew what the time limits were. You chose to use them otherwise. So I'm going to grant the defendant's motion to terminate the deposition.

(ECF 127-1, at 85-86.) *After* the court announced its ruling, Plaintiff's counsel went on a rant complaining about the court:

> I object to your ruling. I think it's inappropriate, and I think you are impermissibly barring evidence.
> The – the rule is a deposition is seven hours, and you gave me just one hour. **And I think it's just completely inappropriate that you are even doing this. It's unheard of.** Even defense counsel would tell you that they've probably never taken a one-hour deposition, much less a two-hour deposition.

> So, again, I – I object.  I think it's inappropriate, and I really don't know why – as I addressed in my objection to the last time you ruled – **I don't know what your issue is with me.**  But I – I do believe it's adversely affecting my client and her right to discovery.  So I just want to that part of the record.

(ECF 127-1, at 86-87 (emphasis added).)  The court did not respond to this commentary.  (*Id.* ("YOUR HONOR: Okay.  Anything further, Mr. Reavey? . . . MR. REAVEY: . . . not at this time.").)

The court got to endure another one of Plaintiff's counsel's rants during a discovery conference on January 25, 2024 (discussed in more detail below).  During that discovery conference, the court explained to Plaintiff's counsel that he was going to have an uphill battle under the 30-day rule to obtain more discovery on spoliation.  In response, Plaintiff's counsel interrupted the court multiple times and complained that he "cannot get a fair hearing or ruling from you on anything."  (ECF 136, at 12-13 ("Mr. Reavey, you need to wait until I call on you to speak.  It's not a phone call, it's a court hearing.  It might be by phone, but it is a court hearing.").)  And he lodged more ad hominem attacks against the court—all of which had no factual basis other than his own frustrations with the court disagreeing with the positions he has taken in this litigation and the court's attempts to maintain decorum during the call.  (*Id.* at 13-16.)

These types of reactions to the court's unfavorable rulings certainly do not comport with the *Pillars of Professionalism*, which instruct counsel to "[a]ccept all rulings, favorable or unfavorable, in a manner that demonstrates respect for the court, even if expressing respectful disagreement with a ruling is necessary to preserve a client's rights."  The court will not indulge Plaintiff's counsel's attempt to mischaracterize the court's adverse rulings into the court having some type of "personal issue" with him.  His reaction simply is what it is—an unwillingness to respectfully accept the court's adverse rulings.  Notably, he did not complain about the court when

its feedback and discovery rulings were largely going Willmore's way when the court was leaning on Savvas about document production issues in the spring and summer of 2023, or telling Savvas during a discovery conference that it would need to produce Lesser for deposition, or ruling in Willmore's favor on the motion to compel the Salesforce documents.  Rather, his backlash surfaced only after adverse feedback from the court (*e.g.*, during discovery conferences when the court would ask him pointed questions that he did not like, or express skepticism about a position he was taking, or manage the conference by trying to minimize his interruptions) or in response to an adverse ruling, such as those concerning the Debiak deposition.

The undersigned is responsible for managing the pretrial phase of this case and handling discovery disputes, and a judge is entitled to "faithfully perform the duties of [the] office." *United States v. Mendoza*, 468 F.3d 1256, 1262 (10th Cir. 2006) ("Unfavorable judicial rulings do not in themselves call into question the impartiality of a judge."); *Lammle v. Ball Aerospace & Techs. Corp.*, 589 F. App'x 846, 849 (10th Cir. 2014) (unpublished) ("Unfavorable judicial rulings and ordinary efforts at courtroom administration are insufficient grounds for recusal.").  These duties include making rulings that are generally adverse to one side or the other.  The court respects a losing party's prerogative to disagree with an adverse ruling, but the court appreciates attorneys who are professional enough to move on from an adverse ruling, without carrying on about it with the level of disrespect the court has seen in this case.

### C.    CONCLUSION

Plaintiff's counsel's lack of professionalism could potentially warrant a range of sanctions, and the court does not foreclose the possibility that such sanctions may be on the horizon at some point in the future—whether in this case or perhaps in another.  *See, e.g.*, *Freeman*, 192 F.R.D. at 189-90 (ordering deposing attorney who behaved appallingly to write a letter of apology to the witness and opposing counsel for his unprofessional conduct, to return fees associated with taking

the deposition, and to take a professionalism course approved by the court).  But § 1927 is the only grounds upon which Savvas seeks sanctions at this time, and the court does not find that such sanctions are warranted.  Plaintiff's counsel did not unreasonably and vexatiously multiply the proceedings simply because he proceeded with the case after he received Savvas's Rule 26 disclosures supporting its defense that Savvas had legitimate, nondiscriminatory reasons for firing Willmore.  Nor will the court sanction him for his frustrations stemming from his own misunderstanding of the law and rules of procedure, or for his belligerent behavior during depositions, or for his intemperate tone toward opposing counsel and the court.  Those actions reflect poorly on him.  But his unprofessional behavior, while lacking decorum, did not unreasonably multiply the proceedings, so the court will not order sanctions under § 1927.

## II.   WILLMORE'S MOTION FOR ADDITIONAL DISCOVERY AND SECOND MOTION TO COMPEL (ECF 139)

The other motion now before the court is Plaintiff's Motion for Additional Discovery and Second Motion to Compel.  By way of this motion, Willmore asks for leave to "conduct additional discovery on the narrow topic of when [Savvas] had knowledge of, and/or reasonably expected, a legal claim by Willmore."  (ECF 139, at 1.)  According to Willmore, she intends to use this discovery to support her motion for spoliation sanctions.  As explained below, Willmore did not raise this issue with the court until January 17, 2024, more than five months after discovery closed and after the court had already entered the pretrial order.  For the reasons set forth below, the court denies Willmore's motion as untimely because she did not file it within the 30-day period set forth in D. Kan. Rule 37.1(c) and she was not diligent in pursuing this discovery thereafter.

### A.   BACKGROUND

Willmore's missing ESI has long been a well-known issue in this case.  To recap the pertinent timeline, Lesser removed Willmore from the Derby School District account in April of

2021.  He began looking into other issues concerning her performance and ultimately put together

a formal recommendation dated May 2, 2021, that Savvas terminate Willmore's employment.

After consultation with Savvas Human Resources (Jolcover) and Legal (Debiak), Lippe authorized

the termination.  On May 18, Lesser terminated Willmore's employment.  (ECF 125, at 11-15.)

More than three months later, Willmore's attorney sent two letters to Savvas dated August 10,

2021: (1) a demand letter stating Willmore would be filing a charge of discrimination and offering

to discuss a resolution of her claims; and (2) a document preservation notice.  (ECF 139-1, at 18-

20.)  Savvas received these letters on August 17, 2021.  (ECF 146-2 ¶¶ 5-6.)

Early in discovery, Savvas disclosed to Willmore on March 1, 2023, that Willmore's emails

"are no longer available given company's retention policy for email accounts pertaining to former

employees."  (ECF 143-5, at 7-8.)  Savvas further disclosed, on March 7, that her "Google Drive

and Gmail account were deleted pursuant to Defendant's retention policy and practice.  This was

prior to the issuance of Plaintiff's demand and subsequent preservation letter."  (*Id.* at 2.)  Savvas

elaborated as follows:

> Plaintiff's laptop was wiped upon her termination and
> refurbished and provided to a new employee.  She was required to
> wipe the memory off her cell phone and send it back to the company.
> Savvas has not issued iPads, but its [sic] my understanding that
> Plaintiff may have been given an iPad by Pearson [Savvas's
> predecessor in interest].  If that is true, she would still have this iPad
> as her own personal belonging.  Please confirm if she does.
>         . . . .
> There is no ESI on Plaintiff's former company-issued laptop or
> her former company-issued cell phone.  **Employee data is not
> stored after an employee is terminated unless there is a legal
> hold in place.  There was no legal hold issued until August 2021
> when Savvas was placed on notice of potential litigation.**
> Brenda's Salesforce data is being preserved. . . .
> Finally, Savvas utilizes cloud storage through Google.  The
> identified employees did not and do not utilize[] separate servers.

(ECF 146-8, at 1 (emphasis added); *see also* ECF 139-1, Willmore Decl. ¶ 12.)  As it turned out, Pearson had provided Willmore with an iPad, which she surrendered upon her termination, and it was recycled.  (ECF 139-1, Willmore Decl. ¶ 12.)

Willmore served discovery directed to the missing ESI.  It was the subject of Willmore's RFP Nos. 22 and 36 served on March 3, to which Savvas responded on April 19 and served a supplemental response on May 11.  (ECF 139, at 3-4; ECF 26; ECF 63, at 11.)  It was also the subject of two Rule 30(b)(6) topics that Willmore provided to Savvas on March 8.  (ECF 139-1, at 22-24.)  In addition, Willmore served Savvas with a Request for Admission ("RFA") that asked Savvas to "admit that—when Savvas erased, failed to preserve, and/or deleted Plaintiff's emails and/or her email account from the devices and/or servers she (Plaintiff) used while employed at Savvas, Savvas had knowledge that Plaintiff was or might be pursuing a legal claim against Savvas."  Savvas denied this RFA.  (ECF 139-1, Willmore Decl. ¶ 16.)

Willmore's missing ESI also repeatedly came up with the court.  In a court filing on June 14, the parties explained that Willmore was seeking certain discovery "[l]argely due to Plaintiff's company issued laptop and iPhone having been wiped of data by Defendant following Plaintiff's firing."  (ECF 40 ¶ 3, at 1-2.)  The motion stated Savvas's "position that—at the time the data was erased—it had no idea Plaintiff would be pursuing a legal claim."  (*Id*. at 2.)  Also, during the discovery conference on July 7 discussing Willmore's RFP No. 4 seeking Salesforce documents, Willmore's counsel emphasized that "it is important that we get everything that is in that Sales Force database for those two clients because, again, my client's laptop and phone were erased by the company so we don't have any – so my hope is there are additional communications within those accounts for Sales Force."  (ECF 66, at 9.)

On July 7, Savvas served a privilege log that withheld communications about Willmore's termination amongst Debiak, Jolcover, Lippe, Lesser and others dated May 3 and 5, 2021, and between Debiak and Yoo on May 18 and 19, 2021; and on August 17 and 20, 2021—the days on and just after Savvas received the demand letter and document preservation notice from Plaintiff's counsel.  (ECF 139-1, at 38-45.)  The privilege log revealed one communication from Debiak to Jeff Wickersty, a Savvas Senior Systems Administrator, dated August 17, 2021, "regarding accessibility of Plaintiff's email account following receipt of demand letter."  (*Id.* at 43.)

On August 15, 2023, Lippe provided deposition testimony consistent with the information Savvas had already provided:

> THE WITNESS:  . . . I don't know anything about Brenda's email that's not outside of standard course for what we typically do, and what we will typically do with an employee is that they send back in their laptops or any type of phone or device or whatever they have that's company property, and then -- then IT will keep that information for so long and then they wipe -- they wipe the information out.

(ECF 115-4, at 134-35.)  Lippe further explained that Savvas keeps an employee's laptop for a certain number of days or weeks before the laptop is wiped and sent out to a new employee taking the place of the old employee; and the departing employee's incoming email are forwarded to either their replacement or their manager to respond to the incoming emails.  (*Id.* at 139, 141-43.)  When asked who at Savvas would be able to "speak intelligently" about the data retention policy, Lippe said Ryan Johnson or "someone in our IT department."  (*Id.* at 143.)  Lippe also testified that Savvas asked departing employees to "return all of their company owned property."  (*Id.* at 144.)  When Plaintiff's counsel asked about how Lippe learned that Willmore was pursuing a legal claim against Savvas, Lippe testified that he recalled receiving a records request "to make sure that we kept all of our records pertaining to Brenda" from legal, and he believed "it would have been

Debi Debiak." (*Id.* at 33-34.) Lippe did not remember talking to Debiak about Willmore possibly pursuing a legal claim when she was fired, and he did not know of anyone else connected to Willmore's termination who knew or suspected she would bring a claim. (*Id.* at 242-43.)

Willmore also asked Lesser questions during his deposition on September 5 about when he became aware that Willmore was pursuing a legal claim. (ECF 140-5, at 256-57 ("again, I've stated this many a times, Patrick, today. I don't know the exact day that I was asked to preserve documents for this case").)

Willmore also deposed Debiak on December 21. Plaintiff's counsel knew from Lippe's deposition testimony more than four months earlier on August 15 that Lippe received the document preservation notice from Debiak. Yet Plaintiff's counsel chose to spend his deposition time with Debiak asking her far-afield questions and did not bother to ask her any questions about document preservation or when Savvas knew or reasonably expected a legal claim by Willmore.

At the time the court convened the pretrial conference on December 21, the parties reported that they had agreed to Willmore taking a "limited corporate representative deposition in January 2024 concerning" the following topics:

> a. Any electronic devices issued to Willmore by Savvas (e.g., laptop, iPad, iPhone), each person or persons who have had possession of them since Willmore was terminated, where they are currently located, whether or not they are operable, what data is stored on them, whether anyone at Savvas is currently using those devices, and the decisions made regarding what to do with the devices and/or data on them following Willmore's termination; and
> b. For the time period after Willmore's termination up until the present, identification of any employees or agents of Savvas responsible for not preserving electronically stored information on the devices issued to Willmore by Savvas (to include, but not limited to, those people who caused the information to no longer be available), and the date or dates upon which said decisions were made and when said decisions were carried out.

(ECF 125, at 18.)

The parties proceeded with that deposition on January 8, 2024, when Willmore deposed Arneja as Savvas's Rule 30(b)(6) designee on those topics. Arneja confirmed what Savvas had already disclosed about Willmore's missing ESI. He further explained that Willmore's laptop was wiped during the course of the typical "offboarding" process for former employees:

> Q. So would you be involved in – in the wiping of Brenda Willmore's laptop?
> A. Not personally. My team does.
> Q. Okay. What is involved in that process?
> A. Just re-wiping and installing the new operating system.
> Q. And how do you – tell me the – the chain of – of you getting that device. Like, who gives it to you, and do you have a ticket you assign it to one of your team members?
> A. Yes. Once the offboarding request of an employee is put in, a label is sent to HR and that employee to send the laptop back to one of the locations that we operate from. . . . One of my technicians would receive that, and if there is no hold on the laptop, then the laptop is wiped clean and placed aside, when there is a request for a new employee to be sent a new laptop.
> Q. Okay. So who makes the decision as to whether data from a particular device is preserved or not?
> A. That comes from legal.
> Q. And who in legal would give that directive?
> A. My point of contact would be Debi. Debi Debiak.

(ECF 139-2, at 10-11.) Savvas received Willmore's returned laptop on July 1, and it was reassigned to a new employee on July 15, so it was wiped sometime between July 1 and July 15. (*Id.* at 15-16.) Willmore's phone and iPad were issued by Pearson, Savvas's predecessor-in-interest, and thus was considered "age-old technology" that Savvas did not keep and instead either recycled as e-waste or sent it back to the carrier. (*Id.* at 19-22, 30-31, 33-34.) Arneja also testified about the ESI preservation process for Google email and Google Drive documents:

> A. It's related to the same process that is for laptops. If the user at the time of offboarding was put on hold, the data will be preserved; otherwise, the emails will be eventually deleted within 30 and 60 days after the offboarding. After those are deleted it will give us another period of about 20 days before everything gets wiped

> from the Google servers and we have no way of recovering anything.

(*Id.* at 42, 44.) He confirmed that "hold" means "legal hold, meaning a message from the legal department that this device or this data needs to be preserved." (*Id*. at 42.) Arneja said that Willmore was offboarded on May 18, Savvas deleted her Google suite account on July 23, and Google would have retained the data in the account for 20 more days (so, until August 12) and then deleted it permanently. (*Id*. at 45-46.) Lastly, Arneja testified about when he learned of Willmore's legal claim:

> Q. When did you first learn that Brenda Willmore was pursuing a legal claim?
> A. We received a notice from legal team on August 24, 2021.
> Q. And was that from Debi Debiak?
> A. Yes.

(*Id.* at 51, 100.) He also testified that, in response to the August 24 email from Debiak, he and/or his team tried to determine if any of Willmore's data still existed, and he ultimately told Debiak that it did not. (*Id*. at 55-57.) At the end of the deposition, Willmore again asked questions about the "hold" checkbox that was not checked on the offboarding ticket. Arneja confirmed that the "[b]ox for hold was not checked in this particular case" and that the ticket was submitted by Jolcover. He could not confirm whether Jolcover or Debiak made the decision ***not*** to check the box to preserve Willmore's data under a legal hold. (*Id.* at 80-84.)

On January 17, Willmore requested a discovery conference. In advance of the conference, the parties submitted the Arneja deposition transcript at the court's request, and the court reviewed it in preparation for the conference. (ECF 136, at 3.) When the court convened the conference on January 25, Willmore raised the issue of Savvas producing redacted communications on Savvas's privilege log that show when Savvas had knowledge of Willmore's potential legal claims and hence anticipated litigation with Willmore and further suggested that the court conduct an in

camera review of these documents to ensure Savvas's redactions were proper.  (*Id*. at 5-6.)
Alternatively, Willmore asked the court for leave to depose Savvas witnesses, including Debiak,
Yoo, and others about the timing of when they were aware there was a legal claim.  (*Id*. at 6-8.)
The court remarked that, insofar as Willmore's motion to compel and request for further discovery
goes, Willmore had been on notice of the issue concerning Willmore's ESI for a long time, and
that Willmore would have "a very, very, very, very, very uphill battle" to show that she complied
with the 30-day rule in D. Kan. Rule 37.1(c).  (*Id*. at 8-16 ("The whole purpose of the 30-day rule
is to avoid stale issues resurrecting like this."; "I'm just letting you know that based on what I see
before me, it looks like you have . . . a real problem with the 30-day issue because you chose to
put this issue on the back burner until after the close of discovery.").)  The court encouraged
Willmore to consider moving forward with the anticipated motion for spoliation rather than
pursuing further discovery.  (*Id*. at 13, 18-19 ("you've preserved your right to file a spoliation
motion based on the current record").)

　　　Undeterred, Willmore filed the current Motion for Additional Discovery and Second
Motion to Compel on February 16.  (ECF 139.)  By way of this motion, Willmore asks for several
things.  In the introduction, Willmore asks "to conduct additional discovery on the . . . topic of
when Defendant had knowledge of, and/or reasonably expected, a legal claim by Plaintiff, and
compelling Defendant to supplement and produce documents responsive to Plaintiff's [RFP Nos.
22 and 36]."  (*Id*. at 1.)  But Willmore's motion then goes on to ask the court to order Savvas also
(1) to produce all "communications that Debiak and/or Jolcover were a part of . . . where Plaintiff's
legal claim or the potential for such claim was discussed and/or any communications about
whether Plaintiff's devices or ESI data on them should be preserved, not preserved, destroyed, or
allowed to expire, and/or be recycled"; (2) for any such documents from Savvas's privilege log, to

produce them with only the truly privileged portions redacted, such that any non-privileged portions of the responsive communications are produced to Willmore—following the undersigned's in camera review to ensure the communications have been properly redacted; and (3) to produce Debiak and Jolcover "[and/or any other Savvas employees responsible for making decisions about not preserving Plaintiff's devices and/or ESI] for deposition questioning (or conduct an in-court hearing where they can testify)" following Savvas's production of those documents; and (4) an award of $2,500 for Plaintiff's attorneys' fees incurred in filing the motion to compel.  (*Id.* at 7-10.)

### B.   ANALYSIS

#### 1.  Legal Standard

A motion to compel "must be filed within 30 days of the default or service of the response, objection, or disclosure that is the subject of the motion, or, for all other disputes, within 30 days after the movant knew or reasonably should have known of the potential dispute."  D. KAN. RULE 37.1(c).  The rule further states that "[t]he court may deny any motion filed after that 30-day period as untimely unless the movant demonstrates diligence in attempting to resolve the specific discovery dispute at issue."  *Id.*  The rationale behind this rule is to "ensure the court can address discovery disputes while they are still fresh, and in turn expedite litigation."  *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, No. 12-2350-SAC-KGS, 2015 WL 13047860, at *5 (D. Kan. Mar. 31, 2015) (quotation omitted).  "This district has consistently construed and applied the 30-day period as beginning when specific information *first* leading to a dispute is discovered."  *Id.* (emphasis in original).

#### 2.  Willmore's Motion is Denied as Untimely Under D. Kan. Rule 37.1(c)

Willmore did not file the current motion "within 30 days of the default or service of the response, objection, or disclosure that is the subject of the motion."  RFP No. 22 seeks Savvas ESI

preservation documents involving the Savvas employees involved in Willmore's termination. Savvas served its response to RFP No. 22 on April 19 and a supplemental response on May 11, 2023, referencing its data retention policy and referring to its "privilege log identifying communications taken by counsel in anticipation of litigation." (ECF 139, at 3-4; ECF 26; ECF 63, at 11.) RFP No. 36 seeks documents amongst Forsa, Lippe, Jolcover, Debiak, and/or Lesser between April 1 and August 19, 2021, referencing a possible legal claim by Willmore against SAVVAS. Savvas served its response on April 19 and a supplemental response on May 11, 2023, objecting on the grounds of attorney-client privilege and/or work-product and further stating that "[t]here are no responsive documents in Defendant's possession, custody, and/or control" (presumably meaning other than those withheld as privileged and/or work product[7]). (ECF 139, at 4; ECF 26; ECF 63, at 11.) Savvas also served a privilege log on July 7. (ECF 49, at 1; ECF 139-1, at 38-45.) So the default 30-day deadline for Willmore to move to compel Savvas to produce additional documents responsive to RFP Nos. 22 and 36 would have been June 10; and that deadline would have been August 6 as to disputes over documents listed on the privilege log. Obviously, Willmore did not meet these deadlines because Plaintiff's counsel did not first request the discovery conference that led to the current motion until January 17, 2024.

Willmore also has not "demonstrated diligence in attempting to resolve the specific discovery dispute at issue," D. KAN. RULE 37.1(c), sufficient to bridge the gap between when the 30-day period expired on August 6 (at the latest) and January 17 when Willmore submitted the request for a discovery conference. Willmore knew about the missing ESI in March 2023 and had

---

[7] Savvas contends that "If Plaintiff reopens discovery to seek all communications between Jolcover and Debiak from May 18, 2021 through August 17, 2021, the only relevant e-mails she will obtain are e-mails either identified on the privilege log or produced in response to Request for Production No. 7, Request for Production 22, or Request for Production 36 (to which Savvas has already indicated that there are no responsive documents)."

ample opportunity to develop the written discovery record concerning this issue before he took Lippe, Lesser, and Jolcover's depositions between August 15 and September 5, and Debiak's deposition on December 21. And he had a full and fair opportunity to question them during their depositions about when they first knew or reasonably expected Willmore to bring a legal claim. Lippe and Lesser answered the questions Willmore asked them on this subject. Lippe also testified, when asked who at Savvas would be able to "speak intelligently" about the data retention policy, that it would be Ryan Johnson or "someone in our IT department." (ECF 115-4, at 143.) So Willmore knew who could answer questions about Savvas's data retention policy, yet waited another five months to depose someone from the IT department on these topics.

Willmore tries to blame Savvas for the delay in taking the Arneja Rule 30(b)(6) deposition. Specifically, Willmore calls out (1) Savvas's rejection of Willmore's requests in March and April 2023 for a corporate representative deposition as to the erased devices and Savvas's insistence that Willmore's deposition be taken first; and (2) Savvas's "repeated delays and errors in producing discovery documents." (ECF 139, at 1.) Willmore insists her motion to compel complies with D. Kan. Rule 37.1(c) because she brought the motion within 30 days of the corporate representative's January 8 deposition and that she "diligently pursued issues surrounding Defendant's failure to preserve data, including the taking of the long delayed corporate representative deposition." (*Id.* at 6.) Willmore claims: "It is hard to fathom what else Plaintiff . . . could have done to get the information that was learned as part of the January 8, 2024 deposition." (*Id.*)

This rhetoric is unpersuasive, as is Willmore's attempt to lay blame on Savvas for the several-months-long delay in taking the corporate representative deposition. Nothing in the Federal Rules dictates the order of depositions, and this court's deposition guidelines require only "*an effort* to schedule depositions at mutually convenient times and places." Willmore could have

and should have noticed up and moved forward with the corporate deposition before the August 11 deadline to complete discovery if Savvas's scheduling delays were interfering with her discovery rights. Even if Willmore was willing to accommodate Savvas's request to take Willmore's deposition first, Savvas took that deposition on May 19. Pushing the corporate deposition to the following January 8 for no apparent reason does not establish diligence. The parties moved forward with several depositions during the discovery period and after the discovery deadline into early September by agreement of the parties. And Willmore made no apparent effort to take the Arneja Rule 30(b)(6) deposition during the downtime when the case was stalled in September, October, and November while the court was resolving the parties' discovery motions. When Willmore finally took Debiak's deposition on December 21, he did not ask her any questions about document preservation even though Lippe had testified that he received the document preservation notice from her. It is clear that Willmore simply put these 30(b)(6) topics on the back burner for many months.

Willmore also claims she "discovered" "new" information during the corporate deposition on January 8. (ECF 139, at 2-3, 6.) But regardless of whatever allegedly "new" information Willmore learned during the January 8 deposition (which, as discussed below, the court is unpersuaded she did), a party cannot agree to conduct discovery beyond the discovery deadline and then use information learned during that deposition re-start the 30-day clock. The purpose of the 30-day rule "is to ensure the court can address discovery disputes while they are still fresh, and in turn expedite litigation." *Continental Cas. Co. v. Multiservice Corp.*, No. 06-2256-CM, 2008 WL 73345, at *4 (D. Kan. Jan. 7, 2008) (clarifying that the 30-day window begins "when specific information *first* leading to a dispute is discovered" (emphasis added).) To hold otherwise would allow parties to eviscerate the 30-day rule by agreeing to put off discovery until after the deadline

to complete discovery, thus rendering that deadline meaningless. *See, e.g., Cash Today, LLC v. MTE LLC*, No. 21-2360-EFM-RES, 2023 WL 2498922, at *6 (D. Kan. Mar. 14, 2023) (denying motion to compel as untimely because parties waited until day discovery closed to schedule a discovery conference for a discovery dispute that arose a year before); *Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB-ADM, 2020 WL 5057482, at *1 (D. Kan. Sept. 2, 2020) (finding no basis to compel further production of contracts "because they were not subject to any pending discovery request during the discovery period" and plaintiff waited until months after the discovery deadline and in the midst of multiple rounds of revisions to the pretrial order to request the contracts).  So none of the allegedly new information learned during the corporate deposition excuses Willmore's delay in moving to compel the documents and information she now seeks.  Willmore's motion to compel is not timely under D. Kan. Rule 37.1(c), and the court denies her motion on this basis alone.

For the same reasons, the court also denies Willmore's additional requests seeking (a) "communications that Debiak and/or Jolcover were a part of . . . where Plaintiff's legal claim or the potential for such claim was discussed and/or any communications about whether Plaintiff's devices or ESI data on them should be preserved, *not preserved, destroyed, or allowed to expire, and/or be recycled*" (emphasis added) and (b) Debiak and Jolcover's depositions or their in-court testimony regarding these communications.  Subcategory (a) is also denied because the italicized language, which is what Willmore is really seeking, is not the subject of any request for production.  RFP No. 22 seeks Savvas documents "reflecting efforts . . . *to preserve*" the ESI of Savvas employees involved in Willmore's termination, whereas Willmore's motion attempts to expand this RFP to include communications by Debiak and Jolcover about Savvas's *failure to preserve, destruction, allowance of expiration and/or recycling* of Willmore's ESI.  So this category of

documents is not even encompassed by RFP No. 22.  Subcategory (b) above is denied for the additional reason that Debiak and Jolcover have each already been deposed in this case and Willmore has not shown that reconvening their depositions would be consistent with Federal Rules of Civil Procedure 26(b)(1) and (2).  *See* FED. R. CIV. P. 30(a)(2)(A)(ii).  Willmore has long known about Savvas's position that Willmore's ESI was gone before Savvas implemented a litigation hold, and yet Willmore apparently chose not to ask Debiak or Jolcover any questions during their depositions about when they knew or reasonably expected Willmore to bring a legal claim.

### C.   CONCLUSION

In sum, Willmore's request for further discovery on the issue of spoliation is denied as untimely.  The court expresses no opinion at this procedural juncture on the issue of spoliation sanctions, which Willmore seeks by way of a separate motion.  The record may or may not support sanctions.  But Willmore had ample motive, time, and opportunity to pursue discovery on the issue Willmore's missing ESI, Savvas's preservation efforts (or lack thereof), and when Savvas knew or reasonably expected Willmore to bring a legal claim.  Willmore's motion is therefore denied.

### III.   THE REMAINDER OF SAVVAS'S SECOND MOTION FOR SANCTIONS IS DENIED (ECF 146)

Lastly, the court turns to the remaining aspect of Savvas's Second Motion for Sanctions—specifically, Savvas's alternative request that Plaintiff's counsel "be required to satisfy personally the excess costs, expenses, and attorneys' fees incurred by Savvas to defend any pre-trial motion filed by Plaintiff after January 25, 2024, including the cost to engage in any additional discovery and/or respond to any discovery-related motion filed by Plaintiff, and any future motion for sanctions based on alleged spoliation of Plaintiff's laptop, cell phone, iPad, and Google account data." (ECF 146, at 1.)  Savvas presumably chose this January 25 date because it is the date of the discovery conference the court held at Willmore's request to discuss ESI preservation issues in

view of the Arneja deposition.  On this, Savvas's motion presents a close call on the issue of sanctions.

As discussed above, the issues Willmore raised during the discovery conference on January 25 could have and should have been raised many months earlier.  Moreover, during the discovery conference, the court repeatedly cautioned Willmore that she would have an uphill battle to show compliance with the 30-day rule in D. Kan. Rule 37.1(c) and thus encouraged Willmore to file the anticipated spoliation motion without seeking leave to conduct additional discovery.  Yet Willmore nevertheless proceeded to file the motion to compel anyway knowing that a mountain of evidence showed she has known about the missing ESI for many months and simply allowed the issue to languish.  Willmore's motion to compel goes beyond the bounds of zealous advocacy.  It is an outlandish violation of both the 30-day rule and the discovery deadline.

Furthermore, it reflects Plaintiff's counsel's attempt to deflect responsibility by trying to lay blame on others for his own lack of diligence.  For example, Willmore argues that counsel allegedly learned "new" information during the Arneja deposition that would justify further discovery.  Willmore points to Arneja's testimony that Savvas has an "internal form" that contains a box that is to be checked if ESI is to be preserved when an employee is off-boarded; that Savvas did not produce that internal form from when Willmore was off-boarded; that Debiak is the one who made the decision to not preserve Willmore's ESI when she did not check the box on Willmore's internal form; and that Debiak is the one who told the IT department to recall Willmore's Google drive license, thus erasing all ESI on her Google drive, including email.  (ECF 139, at 2-3.)  But the fact that the box was not checked on the off-boarding form or that Savvas allowed Willmore's Google drive to expire is no different than saying Savvas did not preserve Willmore's ESI when she was terminated, which Willmore already knew.  Furthermore, Willmore

knew Debiak was the point person for document preservation because Lippe testified on August 15, 2023, that he received the document preservation notice from Debiak.  And Savvas has been steadfast in its position that it did not have a duty to preserve Willmore's ESI until it received Willmore preservation notice, which Plaintiff's counsel sent on August 10 and Savvas received on August 17, 2021.  So the ostensible "facts" that Willmore relies on from Arneja's deposition are not "new."  They simply reflect that Debiak did not take steps to preserve Willmore's ESI before it was wiped, which Savvas disclosed to Plaintiff's counsel nearly nine months before the Arneja deposition.  Moreover, it is not clear from Arneja's testimony that Debiak even was the one who made the decision not to check the box to place a litigation hold on Willmore's ESI.  Arneja testified that he was unsure whether Jolcover even consulted with Debiak about the hold before she submitted the offboarding ticket to IT.  (ECF 143-2, at 80-84.)

In sum, the overall tone of Willmore's motion for further discovery reflects the profound lack of respect for the applicable rules of procedure that Plaintiff's counsel has previously demonstrated in this litigation, whether because of his defiant attitude or his misunderstanding of those rules.  But the court is not inclined to award sanctions under § 1927 simply because a party filed a discovery motion that did not comply with the 30-day rule.  The court therefore denies this aspect of Savvas's motion for sanctions.  As to Savvas's request for costs related to any "future" discovery-related motion or motion for spoliation sanctions, Savvas's motion is denied without prejudice as premature.

**IT IS THEREFORE ORDERED** that defendant Savvas Learning Company LLC's Second Motion for Sanctions (ECF 146) is denied.

**IT IS FURTHER ORDERED** that Plaintiff Brenda Willmore's Motion for Additional Discovery and Second Motion to Compel (ECF 139) is denied.

**IT IS SO ORDERED.**

Dated August 12, 2024, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge
